IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRIAN HOOP,

      Plaintiff,

                                      Civil Action 2:16-cv-140
vs.                                 Judge George C. Smith
                                 Chief Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Brian Hoop, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security  ("Commissioner") denying his application for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 15), Plaintiff's Reply (ECF No. 18), and the administrative record (ECF No. 8).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.      BACKGROUND

Plaintiff filed prior applications for a period of disability, disability insurance benefits and supplemental security income on July 19, 2011, which were denied on September 22, 2011. Plaintiff did not appeal.  (R. at 59-68.)  Plaintiff subsequently filed the instant applications for benefits in March 2012, alleging that he has been disabled since September 27, 2011, due to

lower back pain, arthritis, and numbness/tingling in his left arm.  (R. at 71.)  Plaintiff's

applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing

before an administrative law judge. Administrative Law Judge Karl Alexander (the "ALJ") held

a hearing on March 21, 2014, at which Plaintiff, represented by counsel, appeared and testified.

(R. at 33-58.)  Irene Montgomery, a vocational expert, also appeared and testified at the hearing.

(R. at 92-102.)

On July 9, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within

the meaning of the Social Security Act.  (R. at 51-56.)  On December 4, 2015, the Appeals

Council denied Plaintiff's request for review and adopted the ALJ's decision as the

Commissioner's final decision.  (R. at 1-4.)  Plaintiff then timely commenced the instant action.

## II.  HEARING TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff testified at the administrative hearing that he did not complete a high school

education.  (R. at 37.)  Plaintiff testified that he was divorced with one stepchild.  (R. at 38.)  He

further testified that he could not recall when he was last employed, but that during the relevant

time period, which the ALJ identified as 1997, 1999, 2001-2002 and 2004-2006, he held two

types of jobs: concrete work building bridges and detailing cars.  (R. at 38-39.)  Plaintiff testified

that he had to stop working because back pain prevented him from completing his job duties.  (R.

at 39.)  Plaintiff specified that he would have to take frequent breaks due to the pain, for which

he would get in trouble.  (*Id*.)  Plaintiff testified that he cannot work because when he tries, he

experiences physical and mental issues that torment him to the point of not being able to move

around.  (R. at 39-40.)

Plaintiff acknowledged that he worked briefly in 2013 for a company involved in oil and trucking where his brother was his supervisor.  Plaintiff testified that he was fired after slightly over a month of work for non-performance, when he had difficulty with job functions such as "getting in the truck or trying to get out."  (R. at 46.)

Plaintiff testified that his left arm experienced residual issues from an accident in the late 1980's consisting of "throbs," "shocks," and "tingling" in his hand.  (R. at 40.)  He further testified that he takes prescription pain pills to manage his symptoms.  (R. at 44.)  Plaintiff additionally stated that, without the aid of medication, his pain threshold is at a ten on a scale of 1-10.  With the use of medication, which he takes every four hours, his pain levels decrease to about a seven or eight.  (R. at 47.)  Plaintiff testified that he has trouble sleeping and cannot do so without the aid of his pain medication.  (R. at 45.)

Plaintiff testified that his walks with a single-point cane that was prescribed to him by a doctor because of the difficulty he has with getting up or putting pressure on his back.  Plaintiff believed he was able to walk approximately 100 yards before needing to stop.  (*Id*.)  He is able to walk around a city block but not without some back pain.  Plaintiff testified that he is able to stand for 15 or 20 minutes at a time before he experiences too much pain to continue.  (R. at 42.)  He is able to sit with the help of the cane.  (R. at 43.)

Plaintiff testified that he had a driver's license at one point but was currently under a one-year suspension as a result of an infraction he received for driving while drinking liquid Vicodin that was prescribed to him.  (*Id*.)  Because he is unemployed and without medical insurance, Plaintiff testified that his parents pay for his medical coverage, including doctor's visits.  (R. at 44.)

With respect to household work, Plaintiff testified that he does not grocery shop.  (R. at 41.)  He can sometimes, but not always hold onto a gallon of milk and carry it around.  He can feel heat "but not the way it's supposed to be."  He testified that his functionality is limited due to the injury—for example, he can lift a coin off the ground but is not "very good" at buttoning shirts.  (R. at 41.)  Plaintiff testified that his days are spent watching some TV, alternating between sitting and moving around to prevent stiffening and trying to keep his mind occupied "from the pain and being miserable."  (R. at 48-49.)  He further testified that he is able to navigate steps to get into the one-story house where he resides, albeit not very adeptly.  (R. at 49.)  He uses the cane for assistance in getting around the house.  (R. at 50.)

Plaintiff testified that he no longer has any hobbies nor socializes with friends.  He used to ride four-wheelers, but the last time he did so was three or four years prior to the hearing.  (R. at 50.)

## B.    Vocational Expert Testimony

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past jobs included concrete work laborer for bridge construction and car detailer, both unskilled positions.  (R. at 52.)

The ALJ proposed a hypothetical regarding Plaintiff's residual functional capacity ("RFC") to the VE.   (R. at 52-53.)  Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could perform the following sedentary, unskilled positions in the regional and national economies: Table Worker, Addresser/Mail Sorter, and Document Preparer.  (R. at 53-54.)  The VE testified that requiring a cane for ambulation would not compromise Plaintiff's ability to perform the aforementioned

4

positions.  (R. at 54.)  Frequent fingering, carrying small parts with one hand and 50 percent gripping strength with one hand, however, would be required.  (R. at 55.)  The VE further testified that the job tasks could be performed either sitting or standing.  (R. at 56.)  But, if Plaintiff was off of job tasks 10 percent of the time on a regular, consistent basis, it would become noticeable to the supervisor and compromise full-time competitive employment on a sustained basis.  (R. at 55.)

### III.    MEDICAL RECORDS

#### A.    Relevant Physical History

In 1988, Plaintiff was treated at a hospital for a fractured forearm.  Medical records indicate that he underwent a closed reduction of the radial head and open reduction and internal fixation of the ulna.  He was given antibiotics post-op and his dressing was changed two days after the procedures.  There were no signs of infection, and a long arm cast and splint were applied.  (R. at 427.)

In June 2011, Plaintiff visited Southeastern Regional Medical Center complaining of pain resulting from his niece falling on his left forearm.  (R. at 336.)  He denied any numbness or weakness in the hand, as well as any elbow, shoulder or wrist pain.  An X-ray of his left forearm was negative for any significant issues, aside from showing hardware, including the plate and screws from his prior surgery.  The treatment notes reflect that there were some "surgical irregularities there" but Plaintiff denied any new swelling or irregularity.  He had normal intrinsic and extrinsic strength in his hand and wrist and he was treated by a sling being applied to his left arm and prescribed Naprosyn and Vicodin for pain.  He was told to return if the pain worsened or he experienced any other problems.  (R. at 336-37.)

5

In July 2011, Plaintiff was treated again at Southeastern Medical Center, when he stated that he slipped and fell down several steps, striking his front left tooth.  He was diagnosed with a subluxed tooth and treated by application of a Coe-Pak for stabilization.  Upon being discharged he was told to follow up with a dentist as soon as possible and prescribed clindamycin as well as Percocet and ibuprofen for the pain.  (R. at 332-33.)  The treatment notes state that Plaintiff "is a well developed, well nourished, 40-year-old male in moderate distress."  (R. at 332.)

On June 4, 2012, Mark E. Weaver, M.D. consultatively evaluated Plaintiff at the request of the State Agency.  (R. at 350-54.)  Plaintiff relayed a history of lower back problems stemming from an accident nine years prior when he was hit by a crane.  He stated that he was not being treated for the problems due to a lack of health insurance.  Plaintiff described the problems as "dull achy lower back pain which radiates intermittently into either leg, but denie[d] other radicular symptoms or bowel or bladder dysfunction."  (R. at 350.)  He also complained of a residual injury to his left arm resulting from being hit by an automobile at the age of sixteen and sustaining a fractured forearm, requiring surgery with plating and screws.  As a result of the injury, Plaintiff maintained, he retains "dull achy pain and stiffness in his left arm now and it is weaker than the right which limits lifting and carrying activities with the left upper extremity."  (R. at 350.)  Plaintiff stated that he had a twenty-two (22) year history of smoking cigarettes and was smoking about 1.5 packs per day.  He denied consuming alcoholic beverages or being treated for a drug habit.  (R. at 351.)

Dr. Weaver's evaluation concluded Plaintiff was a "well-developed, well-nourished 40-year-old-male who walked with a stiffened gait complaining of lower back pain."  (*Id*.)  Dr. Weaver noted "extensive scarring with some fascial deformity [] in the ulnar left forearm area

6

from the previously mentioned fracture injury and surgery" as well "atrophy of the left upper

extremity compared to the right," but no asymmetric atrophy in the lower extremities.  (R. at

352.)  Dr. Weaver additionally noted that strength testing showing "ratchet inconsistency with

pain inhibition and giving way in the distal muscle groups of the left upper extremity and in the

proximal muscle groups of the legs secondary to lower back area pain."  (*Id*.)  Active and passive

motion was inhibited in the left elbow and wrist joints but normal in all other major joints.  Dr.

Weaver noted "no tenderness, crepitus, effusion or ligamentous laxity [] in any of the major

joints of the extremeties."  (R. at 353.)  Dr. Weaver also reported atrophy of the intrinsic

musculature of the left hand with grasp, manipulation, pinch and fine coordination activities

being normal in the right hand but "slow and hesitant" in the left.  (*Id*.)  Grip strength averaged

40 kg in the right hand and 20 kg in the left hand, with Plaintiff complaining of left forearm area

pain during the grip testing.  Dr. Weaver also noted that Plaintiff is right-hand dominant.   Dr.

Weaver also found spasm to inspection and palpation in Plaintiff's spine in the lumbar

paravertebral muscles and lumbosacral junction, but no spasm or tenderness in the neck or

middle back areas.  Active motion was normal in Plaintiff's neck but restricted in the

dorsolumbar spine with the Plaintiff complaining of low back pain.  A sensory exam was intact

over the extremities and torso with alleged paresthesia over the ulnar left forearm, hand and left

little finger.  (*Id*.)  Ultimately, Dr. Weaver assessed Plaintiff's ability to do physical activities as

the following: "limited in the performance of physical activities involving sustained sitting,

standing, walking, climbing, lifting, carrying and handling objects with the left hand."  (R. at

354.)  Dr. Weaver opined that Plaintiff would "probably be capable of performing physical

activities involving speaking, hearing, following directions and travel."  (*Id*.)

7

In June 2012, radiological studies revealed disc space narrowing and spurring at L-2 level, but the narrowing was assessed to be "mild" in severity.  (R. at 348.)  The study also noted that Plaintiff maintained his vertebral body heights.  (*Id*.)

On August 1, 2012, Gary W. Routson, M.D., an orthopedist, evaluated Plaintiff due to complaints of pain.  At the evaluation, Plaintiff stated that he was unable to work because of back pain at the junction of his cervical/thoracic spine as well as the thoracic/lumbar junction. Plaintiff also complained of numbness, tingling and pain in both his lower extremities.  Dr. Routson made physical findings of "marked kyphosis of the thoracic spine with pain at each junction," as well as "weakness of his hands and wrist."  (R. at 365.)  More specifically, Dr. Routson noted that Plaintiff had flexion of 20 degrees in his thoracic spine with 10 degrees of flexion in his lumbar spine.  His station gait was normal, he had negative atrophy, his motor sensory skills were intact and he had bilaterally symmetrical reflexes.  Additionally, Dr. Routson assessed that Plaintiff had negative radiculopathy and that his toe and heels were uninhibited. Dr. Routson did note a positive to palpation tenderness in both the thoracic and lumbar spines. (R. at 367.)  As a result of the evaluation, Dr. Routson referred Plaintiff to a spine specialist.  (R. at 366.)

Plaintiff's medical record indicates he sought treatment on September 7, 2012 as a result of back pain flaring up because he slipped while getting into his truck.  His treatment paperwork states that he had no numbness, weakness or tingling.  He was able to get up and move about without assistance.  (R. at 396.)  Plaintiff again visited the emergency room at Southeastern Medical on September 11, 2012 complaining of exacerbated back pain.  The treatment notes state that he is "well-appearing" with no tenderness to palpation over the lumbar portion of his

back.  The notes further state that Plaintiff has full range of motion in his upper and lower extremities with "good strength in both lower and upper extremities" and "normal" deep tendon reflexes in his lower extremities.  (R. at 398.)  The treatment notes also reflect that Plaintiff has chronic lower back pain but probably lacks "severe clinical conditions such as cauda equine syndrome," given the lack of loss of bowel or bladder and no paralysis in his lower extremities. Plaintiff was treated with Naprosyn and Flexeril and discharged.  (R. at 399.)

Plaintiff was also evaluated by Tony Starr, M.D., a primary care doctor at Superior Medical, Inc. in September 2012.  Plaintiff presented to Dr. Starr complaining of lower back pain with radiation down his legs.  Plaintiff stated that his lower back pain was progressive over the previous five years.  Dr. Starr found that Plaintiff had no numbness, no tingling, no weakness, reflexes that were in fact and symmetrical and no evidence of cauda equina.  Dr. Starr also found that Plaintiff had good heel/toe walking.  Plaintiff's left forearm was assessed with muscular deformity due to previous surgery, with limited movement at elbow but no erythema or edema. (R. at 418.)

In October 2012, Dr. Starr referred Plaintiff to Michael Sayegh, M.D., a pain specialist for further evaluation and possible treatment for his left arm, mid-back, low back, right leg and left leg pain.  Plaintiff described the pain as "electrical, burning, constant and shooting."  (R. at 408.)  Upon examination, Dr. Sayegh found "mild decreased sensation in the lateral aspect of the left forearm."  Dr. Sayegh further found "moderate pain and tenderness with active and passive movement" in the left arm with "decreased range of motion."  (*Id.*)  Yet no edema, inflammation or congestion was found.  An examination of the lower extremities showed "mild decreased sensation in the lateral aspect of both lower legs."  (*Id.*)

9

The record reflects that Dr. Sayegh continued to treat Plaintiff through March 2014.   In November 2012, when Plaintiff returned to see Dr. Sayegh for chronic back pain, he stated that his pain had worsened since his October visit, rating it a six out of ten.  Dr. Sayegh's evaluation found "trigger points and tenderness bilaterally and in paraspinal muscles" with "mild decreased sensation in the lateral aspect of his left forearm."  (R. at 410.)  Dr. Sayegh also noted "mild decreased sensation in the lateral aspect of bother lower legs" as well as "mildly positive" leg raising tests.  (*Id*.)  Dr. Sayegh further noted no edema, inflammation or congestion and did not prescribe any medication at that time.  (*Id*.)  An MRI revealed disc degeneration and facet disease, but the central protrusion was "slight," the retrolisthesis and bulging were also "slight" at L2-3 with "mild bilateral neural foraminal narrowing."  Finally, the MRI also revealed "mild central canal narrowing and compression of both proximal traversing nerve roots."  (R. at 411.)

Treatment notes from repeated visits to Dr. Sayegh between December 2012 and January 2014 assess the same physical findings.  (R. at 413, 424, 425.)  Dr. Sayegh prescribed Percocet as needed for chronic pain and advised Plaintiff to follow up periodically with office visits.  (*Id*.)  In January 2014, Dr. Sayegh prescribed a walking cane for Plaintiff to help with mobility.  The prescription indicates a diagnosis of chronic lumbago.  (R. at 426.)

**B.    Relevant Mental Health History**

In October 2012, Dr. Sayegh, who is not a mental health professional, diagnosed Plaintiff with lumbago, sprain/strain, sciatica, pain in the left arm status-post surgery with hardware, anxiety, depression and sleep disturbance.  (R. at 408.)

In October 2012, Plaintiff attended a consultative examination with James Spindler, M.S. (R. at 373-78.)  Plaintiff reported that he could not read or write, attended school through

eleventh grade, and had a valid driver's license with no tickets.  He denied any psychiatric

hospitalizations or mental health services.  He reported that he only occasionally felt depressed,

he tended to worry but seldom felt anxious or frightened, and that he was a little stressed around

too many people but was able to go out into the community as needed.  (R. at 375-76.).  Mr.

Spindler diagnosed borderline intellectual functioning.  Mr. Spindler opined that Plaintiff could

do unskilled jobs; could maintain attention and concentration in a job setting; and was likely to

respond appropriately to supervision, coworkers, and work pressures.  (R. at 378).

   State Agency psychologist, Caroline, Lewin, Ph.D. gave a non-examining mental

assessment of Plaintiff in October 2012.  Dr. Lewin found "mild" restriction of activities of daily

living, and, because of his borderline intellectual functioning, "moderate" difficulties in

maintaining concentration, persistence or pace, no difficulties in maintaining social function and

no repeated episodes of decompensation, each of extended duration.  (R. at 100.)

### IV.  THE ADMINISTRATIVE DECISION

   On May 23, 2014, the ALJ issued his decision.  (R. at 13-27.)  At step one of the

sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.   Is the claimant engaged in substantial gainful activity?
    2.   Does the claimant suffer from one or more severe impairments?
    3.   Do the claimant's severe impairments, alone or in combination, meet or
         equal the criteria of an impairment set forth in the Commissioner's Listing of
         Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.   Considering the claimant's residual functional capacity, can the claimant
         perform his or her past relevant work?

gainful activity since September 27, 2011, the alleged onset date.  (R. at 16.)  The ALJ found that Plaintiff had the severe impairments of degenerative disc disease and degenerative facet disease of the lumbar spine with lumbago and history of sciatica and herniated disc; chronic left forearm weakness/pain, status post remote forearm fracture; and borderline intellectual functioning.  (*Id.*)  The ALJ determined that Plaintiff did not have a severe mental impairment.  (R. at 17-18.)  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 41.)  At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following limitations: requires a sit/stand option without breaking task with the ability to stand/walk for 15 minutes at a time and sit with few limitations except for occasional brief changes of position; can use the non-dominant left upper extremity as a helper hand, with approximately 50% grip strength of the right hand; can perform postural movements occasionally except minimal forward flexion and no climbing of ladders, ropes, and scaffolds; should have no concentrated exposure to temperature extremes and wet or humid conditions, in addition to no exposure to hazards; a low stress environment with no production line or assembly line type of pace, no independent decision making responsibilities, and minimal changes in the daily work routine; limited to unskilled work involving only routine and repetitive instructions and tasks with no reading, writing or math requirements; and no interaction with the general public and no more than occasional interaction with co-workers and supervisors.

---

5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

(R. at 18.) In reaching this determination, the ALJ found that "Dr. Sayegh's examination findings, which support the above-described residual functional capacity, do not show a totally debilitating or worsening condition." (R. at 23.) Consequently, the ALJ accorded "little weight" to Dr. Sayegh's prescription for the cane, "as it appears that the claimant was prescribed a cane based on subjective findings or that it was requested rather than being recommended by Dr. Sayegh because of objective findings." (*Id.*) The ALJ gave "significant weight" to the mental assessment of Dr. Lewin, but also found Plaintiff is "more socially limited than she opined." (R. at 24.) The ALJ gave "little weight" to the overall functional limitations assessed by Dr. Weaver who had not provided care for Plaintiff and "primarily assessed conditions that he noted to be 'probable' and 'possible,' which are not valid diagnoses." (R. at 24-25.) Finally, the ALJ gave "little weight" to the September 2012 functional assessment by Dr. Routson, "which is inconsistent with the above-discussed hearing level evidence, including Dr. Routson's own objective findings." (R. at 25.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff could not perform his past relevant work, but could work as a Table Worker, Addresser/Mail Sorter, or Document Preparer. (R. at 25-26.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 26.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

13

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42

U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial

evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286

(6th Cir. 1994)).

      Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).

      Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th

Cir. 2007)).

## VI.  ANALYSIS

Plaintiff raises two challenges to the ALJ's decision.  Specifically, he contends that: (1) the ALJ committed reversible error because the RCF determination was not supported by substantial evidence; and (2) the ALJ erred in finding Plaintiff's mental impairments non-severe. The Court disagrees and concludes that substantial evidence supports the ALJ's decision.

### A.      RFC Determination

Plaintiff asserts that the ALJ relied upon the opinions of non-treating physicians to the detriment of the treating physicians, resulting in an improper RFC determination.  Specifically, Plaintiff points to Dr. Sayegh, Dr. Weaver and Dr. Routson's medical opinions as contradictory to the ALJ's RFC findings.  (ECF No. 11, at 9-10.)

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The determination of RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).  When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'"  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

15

An ALJ is required to explain how the evidence supports the limitations that he or she set

forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Additionally, the ALJ must consider all medical opinions that he or she receives in

evaluating a claimant's case. 20 C.F.R. § 416.927(d). The applicable regulations define medical

opinions as "statements from physicians . . . that reflect judgments about the nature and severity

of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do

despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a

patient's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R.

§ 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling

weight." 20 C.F.R. § 404.1527(d)(2).

16

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

17

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(e).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### B.    Application

The ALJ did not err in his RFC determination by according improper weight without sufficient explanation to Plaintiff's treating physicians.  As a threshold matter, the ALJ properly found, and Plaintiff does not contest that Dr. Weaver is not a treating physician because he never examined Plaintiff in person.  *Cf.* 20 C.F.R. § 404.1502 (to qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant).

Second, as discussed above, the ALJ did, in fact, consider and evaluate Dr. Sayegh's opinion.  Moreover, he provided good reasons for concluding that the opinion did not impact his RFC determination.  Specifically, the ALJ found that Dr. Sayegh's examination findings "support the above-described residual functional capacity."  (R. at 23.)  Similarly, the ALJ did, in fact, consider and evaluate Dr. Routson's opinion.  (R. at 24.)

Third, the ALJ's opinion satisfies the goal of § 416.927 and is otherwise supported by substantial evidence.  The ALJ makes clear that what sources he credited in formulating his RFC and his bases for doing so.  Specifically, the ALJ considered radiological studies from June 2012 assessing "mild" disc space narrowing and spurring (R. at 348); Dr. Routson's August 2012 evaluation finding normal gait and an ability to heel/toe walk (R. at 367); treatment notes from September 2012 indicating that Plaintiff lacks "severe clinical conditions" (R. at 399); Dr. Starr's

18

September 2012 assessment of an overall lack of debilitating injury (R. at 418); as well as Dr. Sayegh's own treatment notes, which comport with the ALJ's RFC determination. For example, Dr. Sayegh's diagnosis of Plaintiff in October 2012 found only "mild decreased sensation" in the left forearm, "moderate pain and tenderness" in the left arm, no edema, inflammation, or congestion and "mild decreased sensation" in the lateral lower legs. (R. at 408.) The treatment notes further indicate that Plaintiff's condition remained the same through March 2014. (R. at 410, 413, 424, 425.) Finally, despite Dr. Sayegh's prescription of a cane to aid Plaintiff's mobility, Dr. Sayegh's own treatment notes are not consistent with Plaintiff's diagnoses constituting a disability, and the ALJ was justified in his determination not to accord the cane significant weight. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013) (ALJ should examine physician's treatment notes in weighing medical findings).

Fourth, the ALJ found significant credibility issues with the fact that the Plaintiff "worked for many years as a concrete worker in bridge construction, despite his allegations that his left arm/upper extremity has been essentially useless." (R. at 20.) "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996)[1]; *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug.

---

[1]SSR 16-3p, which became effective March 28, 2016, superceded and rescinded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1119029, at *1. Because SSR 16-3p does not include explicit language to

12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).  In light of the above-mentioned objective medical evidence, as well as the fact that the VE classified Plaintiff's previous work activity as heavy exertional, the ALJ did not err in discounting Plaintiff's credibility, which weighed against a finding of a disabled condition.

Plaintiff's subjective attacks on the ALJ for supposedly substituting his own medical judgment is not a cognizable grounds for setting aside findings that are supported by substantial evidence in the record.  *See Mullins v. Sec'y of H.H.S.*, 836 F.2d 980, 984 (6th Cir. 1987) ("Claimaint's argument rests solely on the weight to be given opposing medical opinions, which is clearly not a basis for our setting aside the ALJ's factual findings").

Accordingly, the Undersigned concludes that the ALJ did not err by failing to accord controlling weight to Dr. Sayegh or Dr. Routson's opinions and that he properly weighed the opinion evidence.  Furthermore, substantial evidence supports the ALJ's RFC determination.

## C.    Severity of Mental Impairments

The Undersigned does not agree with Plaintiff's contention that the ALJ erred by determining that Plaintiff did not have a severe mental impairment.  Plaintiff asserts that the ALJ erred by not according Dr. Sayegh's mental health assessment of marked mental deficiencies

---

the contrary, it is not to be applied retroactively.  *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law.  Thus congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *Combs v. Comm'r of Soc. Sec*., 459 F.3d 640, 642 (6th Cir. 2006) ("The Act does not generally give the SSA the power to promulgate retroactive regulations.");  *Cruse v. Comm'r of Soc. Sec*., 502 F.3d 532, 541–42 (6th Cir. 2007) (declining to retroactively apply a newly effective Social Security Ruling in the absence of language reflecting the Administration's intent to apply it retroactively).

controlling weight. The ALJ gave good reasons for giving little weight to the opinion. As the ALJ noted, Dr. Sayegh is not a mental health specialist "and his assessment of mental limitations is not within his medical expertise." (R. at 24.) This counts against according his mental health findings significant weight. *Lane v. Astrue*, 839 F. Supp. 2d 952, 971 (S.D. Ohio 2012). The ALJ also explained that Dr. Sayegh's opinion was inconsistent with the evidence of record; no opinions from any mental health specialists supported Dr. Sayegh's assessment; and Plaintiff did not receive any mental health treatment during the period at issue. These are all good reasons to discount a treating physician's opinions.

Additionally, substantial evidence supports the ALJ's determination of no severe mental impairment. Dr. Lewin, a psychologist, assessed Plaintiff's mental restrictions as "mild" and deficiencies as "moderate," which is consistent with the ALJ's determination. (R. at 100.) The Undersigned notes that the ALJ even assessed Plaintiff's mental social impairment to be greater than that in Dr. Lewin's analysis, but still substantial evidence did not support a finding of a severe mental impairment. (R. at 24.) Substantial evidence supports the ALJ's conclusions, including that Dr. Sayegh's opinion was inconsistent with the evidence of record. For instance, when Plaintiff presented with physical complaints in 2011 and 2012, his mental status was normal. (R. at 354, 387.) In October 2012, Plaintiff told Mr. Spindler that he only occasionally felt depressed, anxious, or frightened, (Tr. 375-76), and Mr. Spindler opined that Plaintiff could do unskilled jobs; could maintain attention and concentration in a job setting; and was likely to respond appropriately to supervision, coworkers, and work pressures. (R. at 378.) Under these circumstances, the ALJ afforded proper weight to Dr. Sayegh and Dr. Lewin's opinions and substantial evidence supports his finding.

21

Accordingly, the Undersigned concludes that the ALJ did not err in finding Plaintiff's mental impairments to be non-severe.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 22, 2017                    _____ /s/ *Elizabeth A. Preston Deavers*
                                            ELIZABETH A. PRESTON DEAVERS
                                            UNITED STATES MAGISTRATE JUDGE